No. 23-3469

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

MENG HUANG,

*Plaintiff-Appellant*,

v.

THE OHIO STATE UNIVERSITY, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:19-cv-01976-JLG-CMV
Hon. James L. Graham

_____

## APPELLANT MENG HUANG'S OPENING BRIEF

_____

Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
Tel:   (412) 566-1500

*Attorneys for Appellant*
*Meng Huang*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1 Appellant Meng Huang makes the following disclosure:

Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.


By: */s/Bruce C. Fox, Esq.*          Dated: August 31, 2023

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ............................................................................ i

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 3

    A.   The Basis for the District Court's Jurisdiction ............................... 3

    B.   The Basis for this Court's Jurisdiction ........................................... 4

    C.   The Filing Dates Establishing the Timeliness of the Appeal ......... 4

    D.   The Appeal is From a Final Order or Judgment ............................. 4

ISSUES PRESENTED ..................................................................................... 4

STATEMENT OF THE CASE .......................................................................... 6

SUMMARY OF THE ARGUMENT ................................................................ 15

ARGUMENT .................................................................................................. 19

I.     The district court committed errors that, cumulatively, were not harmless as they denied Huang a fair trial. ................................................................ 19

    A.   Huang preserved her objections to trifurcation and the district court's evidentiary rulings. ........................................................................ 21

    B.   Standard of Review ....................................................................... 22

    C.   The district court abused its discretion by trifurcating the trial, excluding relevant evidence, and limiting argument on the inferences to be drawn from the evidence that was admitted. ............................ 25

        i.    The district court adopted an overly restrictive framing of Huang's claim. ...................................................................... 26

        ii.   The district court's evidentiary rulings were based on a faulty conception of relevance. ...................................................... 29

        iii.  The district court excluded relevant, admissible evidence. ...... 31

iv.    The district court's orders prevented Huang from arguing the totality of the circumstances to the jury. ...................................32

II.    The district court erred in granting summary judgment for OSU on Huang's Title VII quid-pro-quo sexual harassment and retaliation claims. ................35

A.    Standard of Review ...........................................................................36

B.    The district court failed to address evidence showing that Huang was an employee of OSU. ..........................................................................37

i.    Title VII requires a "totality of the circumstances" analysis to determine whether an individual is an employee. ....................38

ii.    The district court ignored evidence in the record showing Huang was an employee. ..........................................................41

C.    Dismissal of Huang's quid pro quo claim should be reversed............45

D.    The district court ignored evidence of Huang's opposition to Rizzoni's alleged unlawful sexual harassment. ...................................47

**CONCLUSION**....................................................................................................53

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM – DESIGNATION OF DOCUMENTS

# TABLE OF AUTHORITIES

## Cases

*Al-Maqablh v. Univ. of Cincinnati Coll. of Med*., No. 1:11-cv-531, 2013 U.S. Dist. LEXIS 158365, at *22-23 (S.D. Ohio Nov. 5, 2013) ............................................ i

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................ 37

*Ayers v. City of Cleveland*, 773 F.3d 161 (6th Cir. 2014) ...................................... 25

*Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004) ..................................................... 22, 23

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017) .......................................................... 28

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021) .................................... 37

*Bryson v. Middlefield Vol. Fire Dep't, Inc.*, 656 F.3d 348 (6th Cir. 2011) 17, 39, 40, 44

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) ................................... 50

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ......................................... 27

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 555 U.S. 271 (2009) ........................................................................................................................ 49

*Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230 (11th Cir. 2004) ..................... 40, 41

*Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.* 103 F.3d 495 (6th Cir. 1996) ................................................................................. 19, 27

*Dortch v. Fowler*, 588 F.3d 396  (6th Cir. 2009) ..................................................... 25

*Douglass v. Eaton Corp.*, 956 F.2d 1339 (6th Cir. 1992) ....................................... 25

*Frye v. CSX Transp., Inc.*, 933 F.3d 591 (6th Cir. 2019) ........................................ 22

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................. 39

*Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) .................... 24

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) .................................... 26, 27, 28

*Helminski v. Ayerst Labs., Div. of Am. Home Prods. Corp.,* 766 F.2d 208 (6th Cir. 1985) ....................................................................................................................... 24

i

*Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644 (6th Cir. 1986)....................46

*Howington v. Quality Rest. Concepts, LLC,* 298 Fed. App'x 436 (6th Cir. 2008) 37, 47

*In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988) ...............................................24

*In re Beverly Hills Fire Litig.*, 695 F.2d 207 (6th Cir. 1982) ............... 16, 20, 24, 34

*In re Cincinnati Radiation Litig.*, 847 F.Supp. 796 (S.D. Ohio 1995) ...................27

*In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995) ...........................24

*Ivan v. Kent State Univ.*, 863 F.Supp. 581 (N.D. Ohio 1994) .................................40

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) .............................27

*Kauffman v. Allied Signal, Inc.*, 970 F.2d 178 (6th Cir. 1992)................................47

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ............................ 49, 50

*Martin v. Heideman,* 106 F.3d 1308 (6th Cir. 1997).................................. 23, 24, 34

*McDonnell v. Cisneros*, 84 F.3d 256 (7th Cir. 1996) ..............................................49

*Montell v. Diversified Clinical Servs.,* 757 F.3d 497 (6th Cir. 2014).....................30

*Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416 (6th Cir. 2006) .............................23

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ............................. 39, 40

*Robinson v. Runyon*, 149 F.3d 507 (6th Cir. 1998) ................................................30

*Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152 (6th Cir. 1988)...............................23

*See Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) .............................37

*Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir. 2004)........................................39

*Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1996).......................................39

*Thaddeus-X v. Butler*, 175 F.3d 378 (6th Cir. 1999) ..............................................37

*United States v. Whittington,* 455 F.3d 736 (6th Cir. 2006) ...................................25

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) ....................... 47, 49, 50

**Statutes**

28 U.S.C. § 1291 ......................................................................................................4

28 U.S.C. § 1332 ............................................................................3

42 U.S.C. § 2000e(f) ....................................................................38

42 U.S.C. § 2000e-3(a) ................................................................49

**Rules**

Fed. R. Civ. P. 61 .........................................................................22

Fed. R. Evid. 103(a) .....................................................................22

Fed. R. Evid. 401 ................................................................. 16, 25

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Meng Huang respectfully requests that the Court hold oral argument because this case presents novel and important issues regarding (1) the right of graduate students to obtian relief under Title VII of the Civil Rights Act of 1964 when, as here, there is substantial overlap between their roles as "studnets" and as "employees" and (2) the degree of latitude a district court has to separate issues for trial, particularly where the claim at issue requires the jury to conduct a "totality of the circumstances" analysis. With respect to the former, this Court does not appear to have previously issued a ruling in which it has analyzed the interplay between a graduate student's student-related and employment-related roles. *See Al-Maqablh v. Univ. of Cincinnati Coll. of Med.*, No. 1:11-cv-531, 2013 U.S. Dist. LEXIS 158365, at \*22-23 (S.D. Ohio Nov. 5, 2013). As to the latter, this case presents an additional fundamental question regarding the scope of relevance for a substantive due process bodily integrity claim—alleged unwanted sexual touching—where there is no separate claim for retaliation. Huang submits that oral argument may assist the Court in resovling these complex issues.

**INTRODUCTION**

Dr. Meng Huang claims that from 2014 through 2017 Dr. Giorgio Rizzoni, a prominent professor and researcher at Ohio State University's Center for Automotive Research ("CAR"), subjected her to repeated, escalating sexual harassment in the form of unwanted touching and groping during meetings at Rizzoni's office and home, during car rides, and, on one occasion, at a restaurant. In parallel with the increasingly severe touching, Rizzoni engaged in "grooming":[1] alternatively praising or punishing Huang depending on whether she complied with his demands for one-on-one meetings and car rides. Ultimately, Rizzoni retaliated against Huang for her refusal to submit to his advances. This retaliation first came in the form of threats and criticism but escalated in late 2017 when Rizzoni manipulated Huang's Ph.D. candidacy exam[2] to ensure that she would fail and then promptly denied her an opportunity to retake the exam (which is customary) and dismissed her from the program.

---

[1] *See* Anne Barnard, *What does 'grooming' mean in sexual abuse cases?*, N.Y. Times, Dec. 2, 2021, https://www.nytimes.com/2021/12/02/nyregion/grooming-sexual-abuse.html

[2] The candidacy exam is typically a formality, as Ph.D. advisors generally do not schedule the exam unless they expect the student to pass. (Zhang Aff., R. 114-8, PAGEID# 6352). Indeed, Huang is the only Ph.D. candidate in the whole of Rizzoni's career to have been given a failing grade on the candidacy exam. (Rizzoni Ex., R. 98-4, PAGEID# 3905).

When Huang initiated this litigation in August 2018, she alleged a variety of claims under 42 U.S.C. § 1983, Title VII, Title IX, and state law. (Complaint, R.1, PAGEID# 1-64). At issue in this appeal are Huang's Section 1983 claim against Rizzoni for violation of her right to bodily integrity under the Fourteenth Amendment and her Title VII claims against OSU for quid pro quo sexual harassment and retaliation. (*Id.*, PAGEID# 49-51, 52-54, & 54). The district court dismissed Huang's quid pro quo and retaliation claims against OSU at summary judgment, and a jury returned a defense verdict on Huang's Section 1983 claim. (Opinion and Order, R. 143, PAGEID# 6703; Verdict, R. 205, PAGEID# 7708-7712).

At the core of this appeal is the district court's repeated failure to consider the totality of the circumstances, as it was required to do, and to instead disaggregate and fragment Huang's claims. For trial, this led the district court to trifurcate the proceedings and limit the evidence of liability to the issue of whether Rizzoni subjected Huang to unwanted sexual touching. Consequently, the district court excluded evidence of Rizzoni's grooming of and retaliation against Huang. Also left out was evidence from Huang's treating medical providers. The result was a trial at which Huang was barred from presenting significant, corroborating, and circumstantial evidence in support of her claim.

At summary judgment, the district court failed to consider evidence showing Huang was subject to a type and degree of control sufficient to render her an employee for Title VII purposes, and instead accepted at face value OSU's characterization that Huang was a student rather than an employee. As a result, the district court concluded that adverse actions related to Huang's quid pro quo claim were not "employment related." And, with respect to Huang's retaliation claim, the district court considered only Huang's formal report to OSU without regard whether Huang's other actions were sufficient to trigger Title VII's "opposition" clause. Based on this fragmentary analysis, the district court determined that Huang's retaliation claim failed because she did not report Rizzoni until after he had terminated her from the Ph.D. program.

In both cases the district court erred, denying Huang "substantial justice" at trial and failing to construe the facts in the light most favorable to Huang at summary judgment. Accordingly, the district court's decisions should be overturned.

## JURISDICTIONAL STATEMENT

### A.     The Basis for the District Court's Jurisdiction

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Huang's claims arise under the laws of the United States, specifically 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964.

**B.     The Basis for this Court's Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court entered judgment in favor of Rizzoni on Huang's Section 1983 claim following a jury trial. (Judgment, R. 207, PAGEID# 7718). The district court granted OSU's motion for summary judgment on Huang's claims for quid pro quo sexual harassment and retaliation under Title VII. (Opinion and Order, R. 143, PAGEID# 6703; Judgment, R. 210, PAGEID# 7736).

**C.     The Filing Dates Establishing the Timeliness of the Appeal**

The district court entered judgment in favor of Rizzoni on May 5, 2023, and in favor of OSU on May 17, 2023. (Judgment, R. 207, PAGEID# 7718; Judgment, R. 210, PAGEID# 7736). The notice of appeal was filed on May 30, 2023, twenty-five (25) days after judgment was entered in favor of Rizzoni and thirteen (13) days after judgment was entered for OSU. (Notice of Appeal, R. 213, PAGEID# 7751).

**D.     The Appeal is From a Final Order or Judgment**

The May 5, 2023, judgment in favor of Rizzoni coupled with the May 17, 2023, judgment in favor of OSU disposed of all remaining claims between the parties.

**ISSUES PRESENTED**

1.     The district court ordered "trifurcation" of Huang's Section 1983 claim, such that whether Rizzoni subjected Huang to unwanted sexual touching was tried

4

separately from compensatory and punitive damages. Consequently, the court sharply limited the evidence and argument Huang could present, including barring evidence of Rizzoni's retaliatory acts, his manipulation of Huang, and Huang's subsequent medical treatment. Did the trifurcation and subsequent orders therefore deny Huang substantial justice?

2.      The district court concluded that Huang was not an "employee"—and Rizzoni's retaliatory actions not "employment related"—based solely on a July 2014 offer letter from Rizzoni and OSU's characterization of "graduate fellows." But the district court ignored evidence showing that Rizzoni and OSU exercised the type and degree of control sufficient to render Huang an employee under Title VII. Did the district court err in granting summary judgment in favor of OSU on Huang's quid pro quo claim?

3.      Granting summary judgment in favor of OSU on Huang's retaliation claim, the district court considered only Huang's December 2017 report of Rizzoni's sexually harassing conduct, which she made after Rizzoni termianted her from the program. Yet, the evidence shows that Huang engaged in conduct sufficient to trigger Title VII's "opposition" clause prior to that date. Did the district court therefore err in dismissing Huang's retaliation claim against OSU?

## STATEMENT OF THE CASE

### Dr. Meng Huang

In 2013, Huang, a native of China, was an accomplished and gainfully employed engineer working for Shanghai General Motors. (Huang Depo., R. 102-1, PAGEID# 4739; Trial Vol. I, R. 217, PAGEID# 7807). Having completed a master's degree from Tongji University—graduating at the top of her class—Huang sought to further her education by obtaining her Ph.D in the U.S. (Huang Rep., R. 105-12, PAGEID# 5940; Trial Vol. I, R. 217, PAGEID# 7808). After enrolling at OSU with Rizzoni as her Ph.D. advisor, Huang reasonably believed completing her degree depended on remaining in Rizzoni's good graces, for both her visa and funding. (Huang, Depo., R. 102-1, PAGEID# 4723-25).

### Dr. Giorgio Rizzoni

Rizzoni is a professor of mechanical and aerospace engineering at OSU. (Rizzoni Vol. I, R. 98-1, PAGEID# 3441). He is the Director of CAR and holds the Ford Motor Chair in Electrochemical Systems. (*Id.*). CAR is a highly successful center that conducts research in collaboration with automotive manufacturers. (Rizzoni Vol. III, R. 100-1, PAGEID# 4193). Only half a dozen universities in the U.S. have similar research centers. (*Id.*). Furthermore, CAR generates tens of millions of dollars in funding for research at OSU. (Rizzoni Ex., R. 98-3, PAGEID#

3825). According to his CV, Rizzoni has himself raised more than $45 million. (Rizzoni Ex., R. 98-2, PAGEID# 3775).

**Huang accepts Rizzoni's offer to pursue her Ph.D. at OSU**

Huang first contacted Rizzoni by e-mail in December 2013 regarding the Ph.D. program at CAR.[3] (Counterstatement Ex. 1, R. 114-3, PAGEID# 6299-300) Rizzoni responded less than two hours later, encouraging Huang to apply. (*Id.*, PAGEID# 6299). The two met in person for the first time in late March 2014 when Rizzoni invited Huang to meet with him at the Shanghai hotel where he was staying during a trip to China. (Counterstatement Ex. 3, R. 114-5, PAGEID# 6304). Rizzoni also invited Huang to dinner with himself and Phoebe You, the director of OSU China Gateway in Shanghai. (*Id.*). Rizzoni suggested that Huang arrive early so they could spend "some time together…to work in peace and quiet" before dinner. (*Id.*).

Rizzoni greeted Huang in the lobby of the hotel and then escorted her up to his room. (Huang Depo., R. 102-1, PAGEID# 4617-19). Once there, Rizzoni asked Huang to solve an exam problem on his laptop. (*Id.*, PAGEID# 4622-23). The two also discussed the Ph.D. program and CAR. (*Id.*, PAGEID# 4628). While they reviewed Huang's solution to the exam problem, Rizzoni put his arm around Huang's shoulder and grabbed her right side with his other hand. (*Id.*, PAGEID#

---

[3] Huang also investigated programs at other universities in China and the United States, including the University of Michigan, the University of California Berkely, and Penn State University. (R. 105-1, PAGEID# 5507).

4624). And, during their conversation about the program and CAR, Rizzoni continued to grab Huang's hands and rub her shoulders and back. (*Id.*, PAGEID# 4628-31). Rizzoni assured Huang that he would sponsor her Ph.D. program and give her an extra bonus. (*Id.*, PAGEID# 4629). At the dinner with You later that evening, Rizzoni clasped Huang's hand and, referring to Huang, said, "Look at her. Look at her." (*Id.*, PAGEID# 4637).

Shortly after their meeting in Shanghai, Rizzoni offered Huang a Graduate Research Associate position at CAR. (Counterstatement Ex., R. 114-4, PAGEID# 6302). Along with this position, Huang would receive a monthly stipend, including an additional 10% supplemental stipend from Rizzoni's discretionary funds. (*Id.*). Huang hesitated for over a month over whether to accept Rizzoni's offer due to concerns regarding his behavior during their first meeting. (Huang Depo., R. 102-1, PAGEDID# 4645-46). Huang eventually accepted the offer because she wanted to study in the U.S. and to give Rizzoni the benefit of the doubt, chalking up his behavior to cultural differences. (*Id.,* PAGEID# 4646-49).

**Huang's work on behalf of Rizzoni, CAR, and OSU on the Ford URP**

About a month after Huang accepted Rizzoni's offer, Rizzoni informed her that she had been selected to be funded as a U.S. Department of Energy Graduate Automotive Technology Fellow for the first two years of her program. (Rizzoni Ex.,

R. 98-3, PAGEID# 3784). Her stipend, including the supplemental stipend, remained unchanged. (*Id.*).

Rizzoni then assigned Huang to work on a Ford Motor Company sponsored University Research Project ("URP") to model battery aging for electric vehicles. (Anderson Depo., R. 76-1, PAGEID# 659-61; Huang Report., R. 105-12, PAGEID# 5944). Huang's work on the Ford URP doubled as her dissertation project and was a continuation of work conducted by two of Rizzoni's previous graduate students. (Parry Ex., R. 94-4, PAGEID# 2385). Funding for the project was provided by a grant from Ford of about $50,000 per year. (Anderson Depo., R. 76-1, PAGEID# 661-62; R. 98-2, PAGEID# 3776). Huang's work was co-supervised by Dyche Anderson, a researcher and senior engineer at Ford. (*Id.*, PAGEID# 658, 660). For her work on the Ford URP, Huang was required to attend bi-weekly WebEx meetings with the Ford team and to occasionally travel with Rizzoni to Ford's offices in Dearborn, Michigan. (Huang Rep., R. 105-12, PAGEID# 5939; R. 218, PAGEID# 7934). In addition, Rizzoni required Huang to attend frequent one-on-one meetings with him to discuss her research. (*Id.*).

Anderson and Ford were more than pleased with Huang's work on the URP. Anderson himself was impressed with Huang's outstanding technical capability, communication skills, work ethic, and her deep understanding of her research. (Anderson Depo., R. 76-1, PAGEID# 671, 675, 681, 685-89). As a result, Huang

was slated to give the final URP presentation to Anderson's superiors in spring 2018. (Counterstatement Ex., 114-17, PAGEID# 6383-84).

**Rizzoni engages in a pattern of increasingly severe harassment and escalating retaliation**

From her arrival at OSU in 2014 through 2017, Rizzoni subjected Huang to numerous, repeated instances of unwanted touching of a sexual nature, which Huang described in an extensive report. (*Id.*, PAGEID# 5939-81). These incidents occurred in Rizzoni's office, his car, at a restaurant, and in Rizzoni's home. (*See id.*). Huang described these incidents in detail during her testimony at trial. For the sake of brevity, Huang summarizes the following incidents as representative of Rizzoni's actions:

- September 7, 2014. Rizzoni offered to drive Huang from her apartment to campus for a Sunday afternoon meeting in his office. After arriving at the office, Rizzoni held Huang by the shoulder and waist and told her he would "help her succeed." (Huang Rep., R. 105-12, PAGEID# 5944; Trial Vol. I, R. 217, PAGEID# 7869-71).

- January 22, 2015. Rizzoni drove Haung to Dearborn, Michigan, for her first meeting with Ford's researchers. On the drive back, Rizzoni pinched the left side of Huang's face. When they arrived at Huang's residence, Rizzoni got out of the car and, without warning, kissed Huang on the cheek. (Huang Rep., R. 105-12, PAGEID# 5945; Trial Vol. II, R. 218, PAGEID# 7891-92).

- September 18, 2015. Rizzoni asked Huang to join him for dinner at a local restaurant. During the dinner, Rizzoni put his hand on Huang's lap and rubbed her leg. Rizzoni continued rubbing Huang's leg as she tried to push his hand away. Rizzoni said, "Meng, I pay your monthly stipend. You better listen to me. Otherwise, we will have a problem." (Huang Rep., R. 105-12, PAGEID# 5947; Trial Vol. II, R. 218, PAGEID# 7915-17).

- January 24, 2016. Rizzoni insisted that Huang meet with him in his office on a Sunday afternoon. During that meeting, while Huang was talking about her research, Rizzoni pulled her close and squeezed her legs between his thighs while he was sitting in his office chair. (Huang Rep., R. 105-12, PAGEID# 5949; Trial Vol. II, R. 218, PAGEID# 7932). Just a few days later, Rizzoni accused Huang of being "the most stubborn student I have ever come across." (Parry Ex., R. 94-4, PAGEID 2374).

- February 5, 2017. Huang went to Rizzoni's office for a meeting, bringing with her a souvenir she had purchased during her trip home to China over winter break. Rizzoni asked Huang to hang the item—a decorative paper cutout—in his window. While she was doing so, Rizzoni grabbed and rubbed her buttocks. (Huang Rep., R. 105-12, PAGEID# 5953; Trial Vol. II, R. 218, PAGEID# 7938-39).

- February 19, 2017. Huang went to Rizzoni's home for a Sunday meeting. At the time, Rizzoni was recovering from knee surgery, but, notably, had e-mailed his colleagues just days before that "walking is not so bad." (Parry Ex., R. 94-7, PAGEID# 2450). Huang observed that Rizzoni was able to move about the house without assistance. After discussing a technical report Huang had prepared, Rizzoni showed Huang the house while holding her around the waist. Back in the open plan kitchen/living room, Rizzoni cornered Huang by the edge of the sink and held her arm while putting his other hand on her chest. Huang escaped and moved to the couch on the other side of the room. Rizzoni followed and, sitting on an ottoman facing Huang, leaned forward and groped Huang's breast while touching himself through his pants. (Huang Rep., R. 105-12, PAGEID# 5954-56; Trial Vol. II, R. 218, PAGEID# 7944-48).

- August 22, 2017. Huang stopped by Rizzoni's office to let him know she was back on campus. Rizzoni asked her to come in to talk about her research. During this meeting, Rizzoni again groped Huang's breasts. (Huang Rep., R. 105-12, PAGEID# 5960; Trial Vol. II, R. 218, PAGEID# 7963-64).

Huang did not report these incidents at the time they occurred because she feared that her position in the program, her ability to obtain her Ph.D. and her ability to remain in the U.S. depended on maintaining a good relationship with Rizzoni. (Huang Depo., R. 105-1, PAGEID# 5548-50). Indeed, Rizzoni all but told her as

much, accusing Huang of being "stubborn" and "the worst" Ph.D. student he had ever had and repeatedly reminding Huang that she was dependent on him for funding and that it was her job to keep him "happy." (Parry Ex., R. 94-4, PAGEID# 2374-76; Huang Rep., R. 105-12, PAGEID# 5948). As such, although Huang sought, over the years, to avoid being alone with Rizzoni, she ultimately was compelled to put herself in situations where Rizzoni could touch her. (Parry Ex., R. 94-4, PAGEID# 2386-87, 2396). Rizzoni manipulated Huang in other ways, too, including praising her when she did meet with him and holding out the promise of perhaps travelling to conferences or to China together in the future. (Huang Rep., R. 105-12, PAGEID# 5998; Parry Ex., R. 94-4, PAGEID# 2388).

**Rizzoni engineers Huang's failure on the Ph.D. candidacy exam and dismissal from CAR and the Ford URP**

On September 10, 2017, Huang met with Rizzoni and they agreed on her candidacy exam committee members. (Rizzoni Ex., R. 98-3, PAGEID# 3801). Rizzoni e-mailed these professors to request that they serve on Huang's exam committee, and all three accepted. (Counterstatement Ex., R. 114-18, PAGEID# 6386). Included in Rizzoni's e-mail was an explicit statement that Huang would be satisfying the written portion of the exam with her dissertation proposal. (*Id.*). Huang sent Rizzoni a draft of her proposal on September 17, which met with Rizzoni's approval. (Counterstatement Ex., R. 114-19, PAGEID# 6388). Anderson also reviewed and approved of Huang's proposal and, on October 4, Rizzoni instructed

Huang to include Anderson on her exam committee. (Parry Ex., R. 94-4, PAGEID# 2405). On October 21, Rizzoni and Huang met in Rizzoni's office to discuss the proposal. (Counterstatement Ex., R. 98-3, PAGEID# 3803). Rizzoni informed Huang that the proposal was good and that his corrections were minor. (*Id.*; R. 114-20, PAGEID# 6390).

This positive progress towards Huang's candidacy exam did not continue. On November 15, 2017, Huang called in to a Ford URP WebEx meeting from the Scott lab due to licensing issues with the computers at her desk in CAR. (Huang Rep., R. 105-12, PAGEID# 5962-63) During this call, Rizzoni berated Huang, accusing her of lying about the software licenses, refusing to meet with him, and threatening to terminate her Ph.D. because she would not meet with him in person. (*Id.*). Huang became agitated on the subject of Sunday meetings. (Counterstatement Ex., R. 114-26, PAGEID# 6409).[4] Anderson, who witnessed the outburst, e-mailed Rizzoni the next day, suggesting that Huang's reticence to meet "might not be about not wanting to work on Sundays, but rather to be alone in a man's office with no one else in the building." (Counterstatement Ex., R. 114-21, PAGEID# 6392-93).

On November 19, Rizzoni scheduled Huang's candidacy exam for December 8, 2017. (Parry Ex., R. 94-4, PAGEID# 2410). Huang then discovered that Rizzoni

---

[4] This is a prime example of the type of interaction and related events that the district court did not allow Huang to present to the jury. (Trial Vol. III, R. 219, PAGEID# 8211-12).

had changed her committee members without informing her. (Huang Depo., R. 102-1, PAGEID# 4697-98). Rizzoni further shifted from his usual practice and prior statement by assigning Huang an additional written exam in conjunction with the oral candidacy exam. (Rizzoni Vol. II, R. 99-1, PAGEID# 4058-60; Parry Ex., R. 94-4, PAGEID# 2410). On November 21, Rizzoni began coordinating with University officials to defer the decision to renew Huang's appointment until after the exam. (Counterstatement Ex., R. 114-22, PAGEID# 6395). Then, on December 7, Rizzoni e-mailed the members of Huang's exam committee to instruct them to make it a "real exam" and that the "message might be terminal at this time." (Counterstatement Ex., R. 114-23, PAGEID# 6397-98; R. 114-23, PAGEID# 6400-01; Rizzoni Ex., R. 99-2, PAGEID# 4143).

Huang's December 8 exam was not the formality typical of other Ph.D. candidate's exams. (Zhang Aff., R. 114-8, PAGEID# 6352). Instead, pursuant to Rizzoni's instruction to make it a "real exam," the committee bombarded Huang with complex questions, frequently accusing her of being stubborn, difficult, and unresponsive. (Huang Rep., R. 105-12, PAGEID# 6019-23). On December 10, Rizzoni e-mailed the exam committee to discuss administering a "death sentence" in Huang's case. (Rizzoni Ex., R. 99-2, PAGEID# 4145; *id.*, PAGEID# 4148-49). On December 11, Rizzoni informed Huang that she had failed the exam, would not be permitted to retake the exam, would not be continuing her Ph.D. studies, and

would lose her funding. (Rizzoni Vol. III, R. 100-1, PAGEID# 4235-36, 4238-39).

Rizzoni also removed Huang from the Ford URP, informing Ford representative Lori Herman that he had "fired" Huang. (*Id.*, PAGEID# 4251; Counterstatement Ex., R. 114-25, PAGEID# 6403).

Notably, Huang is the only Ph.D. candidate that Rizzoni has ever decided to fail on the candidacy exam, let alone refuse to allow a second chance. (Rizzoni Ex., R. 98-4, PAGEID# 3905). Having lost everything, on December 12 Huang finally broke her silence, reporting Rizzoni's pattern of extensive and pervasive sexual harassment and retaliation to her Department Chair, Dr. Vishnu Subramaniam. (Huang Depo., R. 102-1, PAGEID# 4742-43). She also informed Anderson, who in turn made a report to the University. (Counterstatement Ex., R. 114-26, PAGEID# 6407-12). On December 13, Huang filed a complaint with OSU's Title IX office. (Counterstatement Ex., R. 114-27, PAGEID# 6415-17).

Huang was ultimately allowed to finish her Ph.D. at OSU, although under a different advisor. (Huang Depo., R. 102-1, PAGEID# 4714). She was never reinstated to CAR, nor was she allowed to finish her work on the Ford URP. (*Id.*, PAGEID# 4868-75).

## SUMMARY OF THE ARGUMENT

Huang submits that the district court committed reversible error by (1) trifurcating the trial of her Section 1983 claim against Rizzoni, thereby excluding

relevant, admissible evidence that would have supported her claim and (2) improperly granting summary judgment to OSU on her Title VII quid pro quo sexual harassment and retaliation claims after failing to consider all the evidence in the light most favorable to Huang.

The district court's decision to isolate the issue of whether Rizzoni subjected Huang to unwanted touching for the first stage of the trial—and, consequently, to exclude evidence of Rizzoni's adverse treatment of Huang and the harms Huang suffered—deprived Huang of her right to place before the jury the full context and atmosphere of her claim. *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 217 (6th Cir. 1982) . These issues (retaliation by Rizzoni and Huang's injuries) were not wholly separable from the issue of unwanted touching for at least two reasons. First, while Huang was ultimately required to prove unwanted touching to prevail, evidence of the social context in which those incidents occurred, including Rizzoni's use of his authority to cajole her into settings where the abuse could happen, was relevant to Huang's claim. *See* Fed. R. Evid. 401. Second, Rizzoni was allowed to argue that he was a victim of Huang's desire for revenge for the failed candidacy exam, yet the district court refused to allow Huang similar latitude to rebut these claims. (R. 219, PAGEID# 8314-15). Because these errors cumulatively were not harmless, the judgment in favor of Rizzoni on Huang's Section 1983 claim must be reversed.

In disposing of Huang's harassment and retaliation claims, the district court conducted a perfunctory analysis, concluding that (1) Rizzoni cancelling Huang's supplemental stipend and removing her from the URP were "employment related" actions and (2) Huang had not engaged in protected activity before Rizzoni denied her an opportunity to retake the candidacy exam and terminated her from the Ph.D. program and Ford URP. (R. 143, PAGEID# 6672-73, 6689-91). Both conclusions were error because, in reaching them, the district court failed to consider the whole record in the light most favorable to Huang.

With respect to whether Huang was an "employee" or a "student," the district court's analysis was based entirely on the description of Huang's position in Rizzoni's July 2014 offer letter and on OSU's own characterization of "graduate fellows" as being students, not employees. (Opinion and Order, R. 143, PAGEID# 6670-71). The district court failed to consider evidence showing that Rizzoni—and, by extension, OSU—exercised the kind of control over Huang sufficient to render her an employee for Title VII purposes. *See Bryson v. Middlefield Vol. Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) (requiring totality of the circumstances analysis). Because the district court failed to consider the full picture with respect to Huang's position at OSU, it erroneously concluded that Rizzoni's decision to cut her supplemental stipend and to remove her from the URP were not employment related.

(Opinion and Order, R. 143, PAGEID# 6671-73). However, in view of the full record, a reasonable jury could find to the contrary.

Next, as to Huang's protected activities, the district court only considered Huang's report to Subramanian and OSU human resources. (Opinion and Order, R. 143, PAGEID# 6689-91). However, the evidence in the record shows that Huang consistently resisted Rizzoni by attempting to physically distance herself from him, pushing his hands away, and avoiding one-on-one meetings with him. (Huang Depo., R. 102-1, PAGEID# 4629; Huang Depo., R. 105-1, PAGEID#5537-38; Huang Rep. 105-12, PAGEID# 5947, 5947-48). This conduct is sufficient to constitute "opposition" under 42 U.S.C. 2000e-3(a) because it should have put Rizzoni on notice that his advances were unwanted. Rizzoni's ongoing and escalating retaliation against Huang further evidences his intentional efforts to overcome this resistance. Moreover, Rizzoni's ultimate retaliatory acts related to the candidacy exam followed closely on the heels of Anderson notifying him of the discomfort that meeting alone with Rizzoni likely caused Huang. The temporal proximity between Anderson's e-mail and Rizzoni's adverse actions shows that Rizzoni believed that Huang had reported his conduct (or was likely to), and therefore took steps to discredit her and insulate himself while he still could. In short, the evidence is such that a reasonable jury could find that Huang had engaged in protected activity *before* Rizzoni retaliated.

Because there was sufficient evidence in the record for Huang's quid pro quo sexual harassment and retaliation claims against OSU to survive summary judgment, the district court's conclusion to the contrary must be reversed.

## ARGUMENT

I. **The district court committed errors that, cumulatively, were not harmless as they denied Huang a fair trial.**

In deciding to trifurcate the trial of Huang's claim, the district court stated that it had considered "judicial economy, as well as the efficiency and economy of the parties," and that structuring the trial in this way would "make it much easier to separate and identify and correctly rule on all of the evidence, in light of the various issues that have been raised in the motions *in limine*." (Pretrial Conf., R. 223 at 3:13-16; 4:13-17, PAGEID # 8407-08). The district court attempted to justify its reasoning in a separate order, stating that "'Defendant's alleged manipulation, coercion, and influence with respect to Plaintiff's Ph.D. program and candidacy exam'…is irrelevant to the issue of liability" because "adverse actions, retaliation, coercion, power dynamics and pretext are not built into the elements of the claims and defenses. The inquiry is simply this: did Defendant, acting under color of state law, violate Plaintiff's right to bodily integrity by subjecting her to unwanted sexual touching." (Order, R. 188 at 1, 4 (citing *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.* 103 F.3d 495, 507 (6th Cir. 1996)).

This trifurcated structure unnecessarily complicated what should have been a straightforward—although closely contested—trial of a single plaintiff, single defendant, single claim case.[5] Indeed, the district court's order generated a multiplicity of unnecessary, time-consuming, and confusing issues in which it had to parse whether evidence related Rizzoni's retaliatory treatment of Huang—*e.g.*, his vacillation between praise and harsh criticism, his micromanagement of her studies, his manipulation of her Ph.D. candidacy exam, and his decision to disallow Huang the customary opportunity to re-take the candidacy exam—should be admitted in stage one. As a result, Huang was barred from presenting much of this evidence—she was prevented from "plac[ing] before the jury the circumstances and atmosphere of the entire cause of action," *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 217 (6th Cir. 1982)—despite Rizzoni's defense that Huang's entire claim was manufactured for the purpose of revenge. The trifurcation order and ensuing evidentiary errors were not harmless because they deprived Huang of a fair trial.

---

[5] To be sure, Huang did not object to bifurcation of punitive damages. (Opposition to Bifurcation, R. 168, PAGEID# 7034-35). That said, in opposing Rizzoni's request for bifurcation, she opposed any further or additional atomization of the trial because "[e]vidence of Rizzoni's power and influence at Ohio State University is inextricably linked to the facts at issue in this case, including as to why Rizzoni behaved the way that Plaintiff alleges he did toward her, why he believed he could get away with it, and why the matter was resolved by the University the way that it was." (*Id.* at 1, PAGEID# 7034).

### A. Huang preserved her objections to trifurcation and the district court's evidentiary rulings.

On the final day of trial, after both parties had rested and were set to deliver closing arguments, the district court appeared to acknowledge (at least implicitly) that the issue of whether Rizzoni subjected Huang to unwanted sexual touching was, in fact, *not* wholly separable from the issue of Rizzoni's retaliatory acts and the harms Huang suffered:

> THE COURT: That raises another issue which I must confess: So this was my idea to structure this trial.
>
> I thought it would be fair and efficient. So did it turn out to be fair and efficient or not?
>
> We've heard a lot about the other issues that come in one way or another either – well, through a variety of circumstances, and we've heard a lot of evidence that would relate to the damage side of the case.
>
> So should we just hear it all or does it make sense to complete the stages as I originally intended?

(Trial Vol. IV, R. 220, PAGEID # 8333-34). In response, counsel for Rizzoni commented that "I don't know how we start over now…I just don't think – we have gotten so far in this trial, that I don't think there's any way that we not at least finish this phase." (*Id.*, PAGEID# 8334). Given the circumstances—again, both parties had already rested—Huang's counsel merely concurred with Rizzoni's counsel's unambiguous statement that it would be unreasonable and unworkable to try to revisit the issue, let alone go back and reopen the evidence. (*Id.*). Huang's objection to trifurcation of the case had already been preserved, (Trial Vol. I, R. 217,

PAGEID# 7772-75), and the district court had definitively ruled on multiple occasions both before and during the presentation of evidence that it was not open to revisiting the issue. (*Id.*; Trial Vol. II, R. 218, PAGEID# 7928 ("I've decided…that the logical approach to this trial is to determine first whether there was a constitutional violation. So I'm going to stick to that ruling, and we're not going to get sidetracked in disputes about her academic studies."); Trial Vol. III, R. 219, PAGEID# 8211 ("So, no, we're not going to do that. We're not going to go down that path. We're going to continue on the structure that I've set for the case.").

Huang therefore did not abandon her objection to trifurcation or the district court's evidentiary rulings by not renewing them after the close of evidence, and these issues have been properly preserved for appeal. *See Frye v. CSX Transp., Inc.*, 933 F.3d 591, 602 (6th Cir. 2019) (a party is "not required to object to a prior definitive ruling by the district court").

### B. Standard of Review

A district court's decisions related to bifurcation and admission (or exclusion) of evidence are reviewed under the "harmless error" doctrine. *See* Fed. R. Civ. P. 61. According to that rule, reversible error occurs where the district court's evidentiary rulings affect a party's "substantial rights." *Id.*; *see also Beck v. Haik*, 377 F.3d 624, 634 (6th Cir. 2004) (quoting Fed. R. Evid. 103(a)) *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc).

The harmless error analysis "involves an assessment of the likelihood that the error affected the outcome of the case" such that "[a]pplication of the test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing on upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision." *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988). Furthermore, because "a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation, when deciding whether they were harmless." *Beck*, 377 F.3d at 645. Instead, the "cumulative error" doctrine applies, such that this Court "consider[s] the 'combined effect' of multiple errors to determine whether they are unfairly prejudicial." *Id.* at 644 (citation omitted). Accordingly, cumulative errors are not harmless—even if one or more, standing in isolation, might be—and reversal is required "when the appellate court lacks a 'fair assurance' that the outcome of the trial was not affected by evidentiary error." *Beck.* 377 F.3d at 635.

Errors in ordering bifurcation and in evidentiary rulings are both found where the district court abuses its discretion. *See Martin v. Heideman,* 106 F.3d 1308, 1311 (6th Cir. 1997) (bifurcation orders); *Schrand*, 851 F.2d 156-57 (evidentiary rulings).

With respect to orders separating issues for trial, "[a]n abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 432 (6th Cir. 2006) (citing *In re*

*Bendectin Litig.*, 857 F.2d 290, 307 (6th Cir. 1988)). In separating issues for trial, a district court is "required to consider the potential prejudice to the parties, the possible confusion of the jurors, and the resulting convenience and economy." *Martin,* 106 F.3d at 1311 (citing *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 216 (6th Cir. 1982)). Bifurcation is "appropriate when 'the evidence pertinent to the two issues is wholly unrelated' and the evidence relevant to the damages issue could have a prejudicial impact upon the jury's liability determination." *Helminski v. Ayerst Labs., Div. of Am. Home Prods. Corp.,* 766 F.2d 208, 212 (6th Cir. 1985) (citation omitted). On the other hand, where an issue cannot "be submitted independently of the others without creating jury confusion and uncertainty" bifurcation will "'amount to a denial of a fair trial.'" *In re Bendectin Litig.*, 857 F.2d at 308 (quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). According to the Seventh Circuit, this means that in bifurcating a trial, "the district judge must carve at the joint." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995). As such, a bifurcation order is erroneous where it "deprive[s] plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought into the court, replacing it with a sterile or laboratory atmosphere in which causation is parted from the reality of injury." *In re Beverly Hills Fire Litig.*, 695 F.2d at 217.

An abuse of discretion exists with respect to a district court's evidentiary rulings where the appellate court is "firmly convinced that a mistake has been made." *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (quoting *United States v. Whittington,* 455 F.3d 736, 738 (6th Cir. 2006). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. This standard for relevancy is "extremely liberal." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (citation omitted). Indeed, "even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, *it may not exclude the evidence if it has the slightest probative worth.*" *Whittington*, 455 F.3d at 738-39 (emphasis added) (citation omitted). Furthermore, "in determining whether evidence is relevant, the district court must not consider the weight or sufficiency of the evidence." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992) (citation omitted).

C.  **The district court abused its discretion by trifurcating the trial, excluding relevant evidence, and limiting argument on the inferences to be drawn from the evidence that was admitted.**

The district court abused its discretion by (a) limiting the liability phase of trial to only the issue of whether Rizzoni, acting under color of law, subjected Huang to unwanted sexual touching and (b) excluding evidence that was relevant to supporting her claim. The district court's errors were, furthermore, cumulative. First,

the district court adopted an overly restrictive framing of Huang's claim. Next, based on its framing of Huang's claim, the district court erected a standard of relevance that prevented Huang from presenting to the jury the full picture of her relationship with Rizzoni. Finally, although some scraps of evidence concerning Rizzoni's retaliation and the harm Huang suffered came in, the district court prohibited Huang from presenting argument tying this evidence in with Huang's detailed testimony about Rizzoni's sexual harassment. Had the district court allowed Huang to present a complete picture of the social context in which the touchings occurred, the outcome of this case may well have been different. Indeed, the court's final instructions directed the jury to conduct a "totality of the circumstances" assessment when reaching their verdict, (Jury Instructions, R. 203, PAGEID# 7634), yet the district court prevented the jury from hearing key components of those very circumstances. As a result, the trifurcation order, evidentiary rulings, and limitation on argument denied Huang a fair trial.

### i. The district court adopted an overly restrictive framing of Huang's claim.

Huang's Fourteenth Amendment substantive due process claim deals with "the scope of the right to bodily integrity, an indispensable right recognized at common law as the 'right to be free from … unjustified intrusions on personal security' and 'encompass[ing] freedom from bodily restraint and punishment.'" *Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019) (citation omitted). In other

words, at its heart, the Fourteenth Amendment's substantive due process component is designed to protect individuals from abuse by government agents. *See Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). However, it does not "offer recourse for every wrongful action taken by the government," "otherwise the Clause would turn into 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Guertin*, 912 F.3d at 918 (citations omitted). Accordingly, "a careful description of the asserted fundamental liberty interest is essential," requiring consideration of "how plaintiffs describe the constitutional right at stake and *what the defendants allegedly did to deprive them of that right*." *Id.* at 918 (emphasis added) (citations omitted) (cleaned up).

The right to bodily integrity "is fundamental where 'the magnitude of the liberty deprivation that the abuse inflicts upon the victim strips the very essence of personhood.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 506-07 (6th Cir. 1996)). This Court has recognized that, while such intrusions—and the means used to achieve them—must be "forcible," the force used need not always (or completely) consist of direct physical coercion. *See Guertin*, 912 F.3d at 922 (discussing *In re Cincinnati Radiation Litig.*, 847 F.Supp. 796 (S.D. Ohio 1995)). Accordingly, "to show that the government has violated one's right to bodily integrity, a plaintiff need not 'establish

any constitutional significance to the means by which the harm occurs.'" *Id.* at 919 (quoting *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017)).

Thus, while the invasion of bodily integrity is the ultimate fact to be proven in a claim like Huang's, the means used to accomplish the violation is nevertheless relevant. This matters because Huang's claim is based on the charge that Rizzoni used his position of authority to "groom" her. In other words, the means used by Rizzoni went beyond just subjecting Huang to unwanted touching. Specifically, Huang alleged that Rizzoni leveraged his position as director of CAR and as her Ph.D. advisor to exploit the vulnerability created by Huang's dependence on Rizzoni for her visa and funding. (Complaint, R. 1, PAGEID# 57; Huang Depo., R. 105-1, PAGEID# 5548-50). With this power, Rizzoni maneuvered Huang into situations— meetings, car rides, etc.—where he could be alone with her. It was in the context of these one-on-one encounters that the alleged nonconsensual touching took place. Furthermore, the tenor of Huang's relationship with Rizzoni varied depending on whether she complied with his demands for meetings or resisted or avoided him. The former was rewarded with praise; the latter with increasingly harsh criticism and threats. (*Compare* Counterstatement Ex., R. 114-14, PAGEID# 6372 *with* R. 114-10, PAGEID 6360).

### ii. The district court's evidentiary rulings were based on a faulty conception of relevance.

As a consequence of its hyper-narrow conception of Huang's claim, the district court adopted an overly restrictive view of relevance, drawing a false boundary between evidence of touching and evidence of Rizzoni's retaliatory acts and the emotional and psychological harm suffered by Huang. (Order, R. 188, PAGEID# 7299 ("Plaintiff must first prove that the sexual advances took place in the form of unwanted touching. Then she will be allowed in stage two of the trial to show what injuries she suffered as a result of the unwanted touching and her refusal to submit to Defendant's advances.")).

In other words, the district court's trifurcation order was premised on the idea that Rizzoni's adverse reactions to Huang's resistance and the emotional and psychological harm Huang suffered had no tendency to make the ultimate fact—the unwanted touching—more probable than not because they were merely the effect of Rizzoni's alleged conduct. Yet, by the district court's own concession, "[w]ith additional evidence, a jury could infer that [Rizzoni's] displeasure stemmed from [Huang's] refusal to submit to his sexual advances." (*Id.*) Of course, evidence of Rizzoni's adverse reactions and the harm Huang suffered as a result never would have been presented to the jury in a vacuum. Huang gave detailed testimony at trial about numerous instances of unwanted touching by Rizzoni, beginning in a hotel room in Shanghai and continuing through graphic accounts of assaults in Rizzoni's

home and office. (Huang Depo., R. 102-1, PAGEID# 4624, 4628-31; Trial Vol. II, R. 218, PAGEID# 7944-48, 7963-64). The material excluded by the district court was therefore probative of the social context and effect of Rizzoni's conduct—i.e., circumstantial evidence of Rizzoni's treatment of Huang and the harm she suffered tends to make the fact of unwanted sexual touching more probable than not. *Cf. Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998) (noting that "intentional discrimination is often difficult to prove without significant reliance on circumstantial evidence…Therefore, we must be mindful not to cripple a plaintiff's ability to prove discrimination indirectly and circumstantially 'by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance.'") (citation omitted).

Furthermore (and contrary to the district court's reasoning), courts and juries routinely make the kind of backward-looking inferences the district court prohibited here. For example, in employment retaliation cases, temporal proximity between the protected activity and the adverse employment action can be enough to establish causation. *See Montell v. Diversified Clinical Servs.,* 757 F.3d 497, 505 (6th Cir. 2014) (temporal proximity alone can be enough to establish causation). That is, it is permissible to infer from an adverse action following closely on the heels of protected conduct that the protected activity *was causally linked* to the adverse action. And it is all but a truism to say that the law presumes intent from the natural

and probable outcome of an individual's actions—again, inferring cause from effect. The district court's overly narrow conception of relevance therefore prevented Huang from presenting evidence that would have permitted the jury to do just that: inferring the truth of Huang's testimony about the unwanted touching from Rizzoni's retaliatory acts and the medically documented emotional and psychological trauma Huang suffered.

### iii.    The district court excluded relevant, admissible evidence.

Huang submits the following evidence was admissible and relevant to her claims yet was excluded by the district court at or before trial:

- Testimony from Sheila Westendorf, M.D, and Sarah Philip, CPN, regarding statements made by Huang in seeking medical care after the alleged incidents of unwanted touching occurred. (Order, R. 188, PAGEID # 7300-01; Motion, R. 185, PAGEID# 7276).

  According to the district court, such evidence—i.e., testimony from medical providers regarding Huang's statements in seeking treatment—would be inadmissible hearsay in the first stage of the trial but may be permissible under F.R.E. 803(4) in stages two or three. The district court offered no rationale for why this testimony falls outside F.R.E. 804(3)'s exception at stage one. Regardless, the excluded testimony would have met the requirements of the hearsay exception because the statements were "made by the one actually seeking" treatment. *Field v. Trigg County*, 386 F.3d 729, 735-36 (6th Cir. 2004). Furthermore, such statements are relevant because they tend to corroborate Huang's version of events and the nature and severity of Rizzoni's conduct.

- After Huang testified about an incident on January 24, 2016, in which Rizzoni squeezed Huang's legs between his own and "getting very close to his private area," the district court sustained objections, cutting off Huang's testimony regarding an e-mail Rizzoni sent on January 31 in which he called her stupid and

31

"the most stubborn student I have ever come across." (Trial Vol. II, R. 218, PAGEID # 7930-34). Further testimony regarding this e-mail was relevant to showing context.

- The district court prohibited Huang's counsel from cross-examining Rizzoni regarding an e-mail in which he expressed disdain for Huang to Ford's Lori Herman. (*Id.*, PAGEID# 8104-05). Specifically, Rizzoni stated in his e-mail that "The other 11 [of his Ph.D. students] think I am next to God, and act accordingly. And I treat them like kings and queens. I have never had a student who is so blind to reality, and so hard headed." (Counterstatement Ex., R. 114-10, PAGEID # 6359). The district court again prohibited Huang's counsel from cross-examining Rizzoni using the "next to God" e-mail later in the trial. (Trial Vol. III, R. 219, PAGEID# 8301-02). This e-mail, and related cross-examination, was again relevant to showing context.

- The district court declined to allow Huang's counsel to cross-examine Rizzoni regarding Huang's performance on behalf of Ford or later success in obtaining her Ph.D. (*Id.*, PAGEID# 8211). The district court also prevented Huang from presenting portions of the depositions of Anderson, Matt Page, and Vishnu Subramaniam regarding Huang's ability and performance. (*Id.*, PAGEID# 8225-29, 8231-32). This evidence was relevant to rebutting Rizzoni's claim that Huang's allegations were "revenge" for the failed candidacy exam.

- The district court declined to allow Huang to present deposition testimony from Marcello Canova, one of Rizzoni's proteges and a member of Huang's December 2017 exam committee, in which Canova was impeached multiple times regarding Rizzoni's academic relationship with Huang. (*Id.*, PAGEID# 8232-33). This evidence would have undermined Rizzoni's defense that Huang's claim was motived by a desire for revenge and that Rizzoni was the "victim."

### iv. The district court's orders prevented Huang from arguing the totality of the circumstances to the jury.

In its final instructions, the district court charged the jury with undertaking a careful consideration of the full context in which the alleged violations occurred. In particular, the district court instructed the jury that,

Whether Plaintiff reasonably perceived the touching as conveying a message of sexual desire or interest and whether Defendant engaged in touching with reckless indifference to the risk that Plaintiff would reasonably perceive it that way *requires careful consideration of the social context in which particular behavior occurs and is experienced by its target*, and in making that assessment, you are to consider *the totality of the circumstances*, applying common sense and an appropriate sensitivity to social context.

(Jury Instructions, R. 203, PAGEID# 7634 (emphasis added)). Yet, in conjunction with its trifurcation order and related evidentiary rulings, the district court also refused to allow Huang to offer argument regarding Rizzoni's retaliatory acts to rebut Rizzoni's claim that her allegations were nothing more than an attempt at revenge. (Order, R. 188, PAGEID# 7299; Trial Vol. III, R. 219, PAGEID# 8314-15). That is, even though some small amount of evidence of Rizzoni's harsh treatment came in at trial, Huang was prevented from arguing to the jury that this evidence supported a finding that Rizzoni had engaged in a pattern of grooming, from which the jury could infer unwanted touching.

That is, more than simply not allowing significant evidence of retaliation by Rizzoni and Huang's injuries to come in, the district court's order sharply limited Huang's ability to present a complete picture of the context in which the alleged touching occurred or to argue permissible inferences the jury could draw from the very limited evidence of retaliation and harm that did come in. This deprived Huang of her "legitimate right to place before the jury the circumstances and atmosphere of

the entire cause of action." *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 217 (6th Cir. 1982).

Although not directly on point, this Court's analysis in *Martin* helps illustrate why the district court's trifurcation order and evidentiary rulings constitute reversible error. In *Martin* the district court bifurcated the trial of a Section 1983 claim for use of excessive force into liability and damages phases. Based on that ruling, the court barred plaintiff from introducing medical evidence beyond his condition immediately following the altercation with the defendants. *See Martin*, 106 F.3d. at 1310-11. According to the Court in *Martin,* this was reversible error because "the extent of the plaintiff's damages was relevant to the question of liability." *Id.* at 1312. That is, the jury should have been allowed to consider the longer-term harm suffered by Martin to determine whether the force was excessive, rather than being limited to examining only the direct application of force during the altercation. In other words, the district court's decisions in *Martin* prevented plaintiff from presenting evidence of the effects of defendants' actions from which the jury could have inferred liability.

A similar analysis should apply here. To be sure, the elements of an excessive force claim are different from those of an invasion of bodily integrity claim. But the fact remains that the jury should have been allowed to consider the totality of the circumstances when reaching their verdict on Huang's claim. They were not.

Although not direct evidence of an ultimate fact, a reasonable jury could infer from Rizzoni's treatment of Huang—including, for example, the highly suggestive timing between Anderson's November 2017 e-mail and Rizzoni's campaign to ensure that Huang failed the candidacy exam (Counterstatement Ex., R. 114-21, PAGEID# 6392-93; R. 114-24, PAGEID# 6397-98)—that Huang's allegations about were true. The testimony of medical providers who treated Huang in the aftermath of Rizzoni's abuse would have further corroborated Huang's claims. (Motion, R. 185, PAGEID# 7276-77). By denying Huang the opportunity to present these facts, the district court impermissibly tipped the scales in Rizzoni's favor.

As such, the errors discussed above were not harmless and this case must be remanded for a new trial.

## II. The district court erred in granting summary judgment for OSU on Huang's Title VII quid-pro-quo sexual harassment and retaliation claims.

At summary judgment, the district court ruled in Defendants' favor on the bulk of Huang's then-remaining claims, ultimately allowing only Huang's Section 1983 claim against Rizzoni to proceed. For purposes of this appeal, Huang challenges the district court's grant of summary judgment on her claims against OSU for (1) quid pro quo sexual harassment and (2) retaliation under Title VII.

As to the quid pro quo claim, the district court concluded "as a matter of law" that Huang was a student, not an employee, in her capacity as a Graduate Fellow

from May 2014 to August 2017. (Opinion and Order, R. 143, PAGEID# 6671). Consequently, the district court held that Huang could not establish the "adverse employment action" element of a prima facie case under Title VII. (*Id.*, PAGEID# 6671-75). With respect to the retaliation claim, the district court found that Huang's first protected activity was her report to Subramaniam and an OSU human resources employee on December 12, 2017. (*Id.*, PAGEID# 6690). Because Huang made her report after Rizzoni removed Huang from the graduate program and the URP, the court held that Huang could not establish causation. (*Id.*, PAGEID# 6690-91).

Both conclusions were error and must be reversed because the district court failed to consider the full record on summary judgment and failed to construe the evidence in the light most favorable to Huang. Had it done so, the district court would have been constrained to find genuine issues of material fact as to whether Huang suffered adverse actions related to her employment and whether she engaged in protected conduct prior to December 11, 2017.

## A.    Standard of Review

This Court reviews a grant of summary judgment *de novo*. *See Bledsoe v. TVA Bd. of Dirs.*, 42 F.4 th 568, 577 (6th Cir. 2022) (citation omitted). Summary judgment should be reversed where "the nonmoving party has presented evidence of specific facts, which, viewed in the most favorable light, indicates that there is a genuine issue for trial." *Thaddeus-X v. Butler*, 175 F.3d 378, 385 (6th Cir. 1999) (en

banc). "An issue of fact is 'genuine' if a reasonable person could return a verdict for the non-moving party." *Howington v. Quality Rest. Concepts, LLC,* 298 Fed. App'x 436, 440 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing the record, this Court does "not judge credibility or weigh conflicting evidence; instead, we believe the evidence of the nonmoving party, and draw 'all justifiable inferences' in [her] favor." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021) (citations omitted).

## B. The district court failed to address evidence showing that Huang was an employee of OSU.

In reaching its conclusion that "Plaintiff was not employed by the university until she was appointed as a Graduate Research Associate in late August 2017," (Opinion and Order, R. 143, PAGEID# 6671), the district court relied exclusively on the July 2014 letter in which Rizzoni informed Meng that she had been "selected to be funded" as a Graduate Fellow. (*Id.*, PAGEID# 6670). Rizzoni's letter noted that "During the first year, and thanks to the Fellowship, you will have the opportunity to take courses and to prepare for the Ph.D. Qualifying Exam. You will not have any specific research assignments, but you will participate in the meeting of my electrochemical energy storage systems research to become familiar with our work." (*Id.* (quoting Huang Rep., R. 98-3, PAGEID# 3784). According to the district court, "Rizzoni's letter outlines a purely academic relationship, not an employment relationship." (*Id.*) In the district court's view—again, relying solely on Rizzoni's

July 2014 letter—"Plaintiff was not obligated to perform any work or service for OSU. Any work she did was in pursuit of her own educational goals…She was in complete control of how to conduct her academic studies, the amount of time she devoted to them, and whether she read an assignment or attended a lecture or meeting." (*Id.*)

Based on this perfunctory analysis, and without considering any countervailing facts in the record showing the nature and degree of control exercised by Rizzoni over Huang, the district court accepted at face value OSU's position that Huang's stipends and work on the URP were "not employment related." (*Id.*, PAGEID# 6673). Had the district court considered the totality of Huang's relationship with OSU, however, it would have been constrained to conclude that a genuine issue of fact existed as to whether Huang was an employee.

### i. Title VII requires a "totality of the circumstances" analysis to determine whether an individual is an employee.

Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). "Because this definition 'is completely circular and explains nothing,'" this Court has adopted the "common law agency test" to determine "whether an employment relationship exists." *See Bryson v. Middlefield Vol. Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011). Under that test, and because "alleged employee-employer relationships can be complex and may not fit neatly into one particular categorization," this Court has said "all incidents of the relationship" must

be considered, "no matter how the parties characterize the relationship."[6] *Id.* at 355

Factors to be considered include,

> the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir. 1996) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (citations omitted); *see also Shah v. Deaconess Hosp.*, 355 F.3d 496, 499-500 (6th Cir. 2004)). Furthermore, "when evaluating a particular relationship, 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Bryson*, 656 F.3d at 354 (quoting *Darden*, 503 U.S. at 324).

Importantly, courts to have assessed whether graduate students working under conditions like Huang are employees for purposes of Title VII have concluded that they are. *See, e.g., Ivan v. Kent State Univ.*, 863 F.Supp. 581, 585-86 (N.D. Ohio 1994) (analyzing graduate student's relationship with university and finding, "[t]he

---

[6] Indeed, an employer's written job offer or job description should be given little weight in ascertaining whether an individual is an employee under the statute. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006) (first amendment retaliation context, noting that, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform.").

fact that Ivan was a student does not negate her employee status…The totality of the circumstances of Ivan's graduate assistantship demonstrates she was an employee under the terms of Title VII.") *affirmed* 92 F. 3d 1185 (6th Cir. 1996). The plaintiff's graduate program in *Ivan* "included academic course-work and clinical practice, called a 'clinical practicum.'" *Id.* at 583. The plaintiff "was provided with a full tuition scholarship and a graduate student assistantship stipend," subject to three contracts which "provided for Ivan's employment as a graduate assistant." *Id.* In addition, "Kent state withheld state retirement benefit contributions from Ivan's pay." *Id.* Viewing these facts in the light most favorable to the plaintiff, the district court rejected defendant's position that the plaintiff was, as a matter of law, not an employee for purposes of Title VII. *See id.* at 585-86.

The Eleventh Circuit in *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234-35 (11th Cir. 2004) reached the same conclusion in another Title VII case involving a graduate student. There, the court looked to facts showing that

> (1) she received a stipend and benefits for her work; (2) she received sick and annual leave; (3) a comprehensive collective bargaining agreement governed her employment relationship with the University; (4) the University provided the equipment and training; and (5) the decision not to renew her appointment was based on employment reasons, such as attendance and communication problems, rather than academic reasons.

*Id.* at 1234. Surveying the available case law, the Eleventh Circuit found that "Courts…have typically refused to treat [graduate students] as 'employees' for Title

VII purposes only where their academic requirements were truly central to the relationship with the institution." *Id.* at 1235. Accordingly, the court found that while "Cuddeback's course work obligations required her to complete a rotation in three laboratories and much of her work in Dr. Wang's lab was to fulfill the program's requirements, the economic realities of this particular situation lead us to conclude that the district court correctly found that Cuddeback was an employee for Title VII purposes." *Id.*

      ii.    **The district court ignored evidence in the record showing Huang was an employee.**

Here, the totality of the circumstances shows there is a genuine question of fact as to whether Huang was an employee for purposes of Title VII. Shortly after she matriculated at OSU, Rizzoni assigned Huang to work on the Ford URP to model battery aging for electric vehicles. (Anderson Depo., R. 76-1, PAGEID# 659-61; Huang Rep., R. 105-12, PAGEID# 5944). This was a continuation of research that began under some of Rizzoni's previous students, went directly to furthering Rizzoni's own work at CAR, and was funded by a grant from Ford. (Parry Ex., R. 94-4, PAGEID# 2385; Rizzoni Ex., R. 98-2, PAGEID# 3776; Anderson Depo., R. 76-1, PAGEID# 661-62). As part of the project, Huang was required to attend regular meetings with Rizzoni and the "battery group," attend regular WebEx meetings with the Ford team, and travel to Dearborn, Michigan, with Rizzoni for meetings regarding the URP. (Huang Rep., R. 105-12, PAGEID# 5943, 5945, 5949).

And, although Huang's research for the URP was also her dissertation topic, she had no meaningful choice in whether to accept the assignment. (*Id.*, PAGEID# 5944-45).

Next, far from the district court's view that Huang "was in complete control of how to conduct her academic studies," the evidence shows that Rizzoni exercised a great amount of control over Huang's classes, up to and including requiring her to drop classes. (Parry Ex., R. 94-4, PAGEID# 2374). Rizzoni also threatened to cut Huang's funding if she did not drop certain classes. (*Id.*, PAGEID# 2375). Similarly, Rizzoni dictated that Huang complete ancillary assignments, such as reviewing academic papers and grading homework for Rizzoni's classes. (Huang Rep., R. 105-12, PAGEID# 5950-51).

Finally, in addition to a scholarship covering tuition and fees, Huang received a monthly stipend. (Counterstatement Ex., R. 114-4, PAGEID# 6302). Rizzoni supplemented this stipend by an additional 10% from discretionary funds he controlled. (*Id.*) Notably, although the district court attached great weight to the label "graduate fellow," the financial terms of Huang's appointment to that position were identical to the "graduate research associate" position that Huang initially accepted. Rizzoni himself appears to have considered the stipend as being employment-related. (Rizzoni Depo., R. 98-1, PAGEID# 3606-07; Parry Depo., R. 94-4, PAGEID# 2376 (Rizzoni e-mail to Huang stating: "Do not forget that I am the one

who pays the bills. It's time to stop acting like a student, and start acting like a professional, in everything you do.")). Yet, according to the district court "[t]hese payments are in the same category as an academic scholarship. There is no mention of living expenses. It is clear that education, not money, was at the core of this relationship." (Opinion and Order, R. 143, PAGEID# 6671). The district court's perplexing and unsupported conclusion on this point (what was the stipend for, if not living expenses?) is undermined by Rizzoni's persistent threats to strip Huang of her funding. (Parry Depo., R. 94-4, PAGEID # 2374 (Rizzoni commenting, "I am clearly not getting my money's worth."), 2375-76). None of Rizzoni's threats included any reference to deficient academic performance; rather, each was couched as the consequence of Huang not meeting with him or following his "advice." (*Id.*). Indeed, when Rizzoni eventually did cut Huang's 10% supplemental stipend in August 2017, he cited no academic justification. (Huang Rep., R. 105-12, PAGEID# 5962; Counterstatement Ex., R. 114-16, PAGEID# 6378).

The ultimate problem with the district court's analysis of whether Huang was an employee for Title VII purposes, like with its decision to trifurcate the trial on Huang's Section 1983 claim, is its insistence on drawing fine-grained distinctions where a view to the totality of the circumstances is required. With respect to Huang's Title VII claims, this results in the faulty conception that a graduate student's relationship with his or her university can be neatly dissected, and the "student" facet

severed from the "employee" facet. But as in *Ivan* and *Cuddeback,* the features of Huang's relationship with OSU bearing the indicia of "student" inevitably overlap and bleed into those features that mark her as an employee. In short, the district court failed to follow this Court's instruction that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Bryson*, 656 F.3d at 354 (citation omitted).

Moreover, the evidence discussed above was sufficient to create a genuine fact issue as to whether Huang was an employee: (1) OSU compensated Huang beyond merely the cost of attendance and fees; (2) she "rendered service" to the university in conducting research at the direction of Rizzoni and in furtherance of Rizzoni's own research at CAR, subject to a grant from an outside source; (3) she rendered service in the form of ancillary assignments; and (4) Rizzoni ultimately exercised a great degree of control over both Huang's studies and her research, up to and including dictating which classes Huang could and could not take.

Viewed in their full context, these facts do not resemble the free-wheeling, self-directed relationship between a student and a university envisioned by the district court, where—subject only to degree requirements and minimum academic performance standards—the student has control over their own course of study. Instead, it reflects a kind of contemporary update on the master-apprentice relationship from a medieval guild. From these facts a reasonable jury could find

44

that, through Rizzoni, OSU exercised sufficient control over Huang to render her an employee for purposes of Title VII.

**C.    Dismissal of Huang's quid pro quo claim should be reversed.**

The district court dismissed Huang's claim for quid pro quo sexual harassment primarily on the basis that the adverse actions were not related to Huang's employment by OSU. (Opinion and Order, R. 143, PAGEID# 6672-75). Because there is, for the reasons set forth above, a genuine issue of fact as to whether Huang's supplemental stipend and her URP work were "employment" related, summary judgment must be reversed. That said, two additional points merit discussion.

First, according to the district court, an employee will prevail on a quid pro quo claim where she can prove: "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) her refusal to submit to the unwelcome demands resulted in an adverse employment action; and (5) liability may be imputed to the employer." (*Id.*, PAGEID # 6671-72 (citation omitted). However, as to the fourth element, this Court has held that a plaintiff may also proceed by showing "that the employee's submission to the unwanted advances was an express or implied condition for receiving job benefits." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). The evidence here would allow a reasonable jury to conclude that this was the case with respect to Rizzoni's treatment of Huang.

Over the course of their relationship, Rizzoni repeatedly threatened Huang's funding if she did not make him "happy." (Parry Ex., R. 94-4, PAGEID# 2374-76; Huang Rep., R. 105-12, PAGEID# 5948). These threats often followed close on the heels of Huang avoiding or refusing to meet alone with Rizzoni or rejecting his advances. (*See, e.g.,* Huang Rep., R. 105-12, PAGEID# 5949 and Parry Ex., R. 94-4, PAGEID# 2374; Huang Rep., R. 105-12, PAGEID# 5950 and Parry Ex., R. 94-4, PAGEID# 2374). Furthermore, Rizzoni's negative reactions went beyond criticisms directed only to Huang. For example, in the fall of 2016, Rizzoni e-mailed Ford representatives to dissuade them from offering Huang an internship, commenting that Huang was "the worst PhD student he ever had" because she would not listen to his "advice." (Counterstatement Ex., R. 114-9, PAGEID# 6354). The message behind Rizzoni's comments to Huang and others was clear: Huang must submit to Rizzoni's demands or she would be removed. This evidence is sufficient to establish the fourth prong of a quid pro quo claim.

Next, although the district court did not address the respondeat superior liability prong, the evidence here was sufficient for Haung's claim to meet that element. "Under the theory of respondeat superior, employers are held strictly liable for conduct of supervisory personnel who have plenary authority to hire, fire, promote, and discipline employees." *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 186 (6th Cir. 1992). "Strict liability, however, is not limited to supervisors with such

broad authority. Rather, 'all that is required is that the employee have 'significant control' of those duties.'" *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. App'x 436, 441 (6th Cir. 2008) (quoting *Kauffman*, 970 F.2d at 186)). Furthermore, the *Faragher/Ellerth* defense is unavailable where the harassment culminates in a tangible employment action. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021). Here, the evidence is unquestionably sufficient for a reasonable jury to find that Rizzoni exercised the kind of significant control necessary to impute liability to OSU.

Accordingly, and contrary to the district court's findings, Huang presented sufficient evidence of her quid pro quo claim to survive summary judgment. The district court's conclusion to the contrary must be reversed.

## D. The district court ignored evidence of Huang's opposition to Rizzoni's alleged unlawful sexual harassment.

The district court held that "Plaintiff's first statutorily protected activity was reporting Rizzoni's alleged sexual harassment to Subramaniam and an OSU human resources employee on December 12, 2017." (Opinion and Order, R. 143, PAGEID# 6690). Because that report was not filed until the day after "Rizzoni made…the decision to not allow [Huang] to retake the Ph.D. candidacy exam, which resulted in Plaintiff's removal from the graduate program and the Ford URP" the district court concluded that Huang's retaliation claim failed because she could not "establish that an adverse action was taken against her 'subsequent to engaging in protected

activity." (*Id.*, PAGEID# 6691). However, the district court did not consider two other sources of protected activity identified in Huang's opposition to OSU's motion: (1) "that Huang withdrew from [Rizzoni's] constant unwanted touching" and "attempt[ed] to avoid meeting with him in person" and (2) Huang's verbal altercation with Rizzoni on November 16, 2017, which prompted Anderson to inform Rizzoni that Huang was likely uncomfortable meeting with Rizzoni alone in his office. (Opposition, R. 114, PAGEID# 6267).

Title VII prohibits an employer from retaliating against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a). To establish her prima facie claim of retaliation, a plaintiff must satisfy four elements: "(1) they engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021) (citation omitted).

With respect to the protected activity element, "[t]he opposition clause of Title VII makes it 'unlawful […] for an employer to discriminate against any […] employe[e] […] because he has opposed any practice made […] unlawful […] by this subchapter.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014)

(quoting 42 U.S.C. § 2000e-3(a)). "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning, 'to resist or antagonize […]; to contend against; to confront; to resist; withstand.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)). Accordingly, "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730. Indeed, courts have held that passive resistance "is a time-honored form of opposition." *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996).

Next, "[i]n the retaliation context, the term 'adverse employment action' encompasses more than just actions that affect 'the terms, conditions or status of employment'…It includes conduct 'that would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wyatt,* 999 F.3d at 419 (citation omitted). Furthermore, "[u]nlike a Title VII discrimination claim, 'the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.'" *Laster*, 746 F.3d at 731 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)). Thus, even if Rizzoni's retaliatory acts related to Huang's candidacy exam were, indeed, purely "academic" decisions, they may still constitute adverse actions within the context of

Title VII's anti-retaliation provision. Similarly, Rizzoni's repeated threats, harsh criticism, and efforts to interfere with Huang obtaining an internship with Ford likely also qualify as adverse actions because a graduate student in Huang's position might be dissuaded from reporting as Rizzoni made clear that opposition to him would jeopardize her status in the Ph.D. program and future job prospects. *See Burlington*, 548 U.S. at 82 (noting that "[a]n act that would be immaterial in some situations is material in others.").

Here, there is sufficient evidence to generate a genuine dispute of fact as to whether Huang engaged in protected activity before her December 12, 2017, report to OSU. First, Huang consistently sought to avoid or extricate herself from situations in which Rizzoni subjected her to unwanted touching. (Huang Depo., R. 105-1, PAGEID# 5537-38). This Court has found similar (although more direct) opposition to sexual advances sufficient to constitute protected activity. *See Wyatt*, 999 F.3d at 421 ("Wyatt's first protected activity, her opposing Mullen's sexual harassment, occurred throughout September 2015," where Wyatt did not report Mullen's behavior until December). While it is the case that Huang never explicitly told Rizzoni "no," her testimony establishes that a reasonable person would understand her consistent reactions to Rizzoni's advances—moving away from him, attempting to push his hands away, avoiding meetings—to have expressed that the touching was unwanted.

Furthermore, this is a context in which the substantial power differential between Huang and Rizzoni must be considered. Huang is a Chinese woman who came to the United States on a temporary visa. (Huang Depo., R. 105-1, PAGEID# 5548-51). Huang was distanced from her family, her homeland, her mother-tongue, and all systems of community support that many young women develop at this point in their life. (*Id.*). Isolated in Ohio with Rizzoni as her primary contact and source of support, Huang reasonably feared, especially in light of Rizzoni's repeated threats to cut her funding that active opposition to Rizzoni's sexual harassment would cost her the life-changing opportunity she had travelled across the world for in the first place: to obtain her Ph.D. (*Id.*).

Moreover, a reasonable jury could infer that Rizzoni himself understood Huang to be resisting him. Rizzoni praised and complemented Huang when she complied with his command to attend one-on-one meetings, during which he seized the opportunity to inappropriately touch or grope her. (Huang Rep., R. 105-12, PAGEID# 5996, 5999; Counterstatement Ex., R. 114-10, PAGEID# 6372) On the other hand, when Huang resisted, especially by avoiding Rizzoni, he subjected her to harsh criticisms and threats to cut her funding—threats he eventually made good on. (Counterstatement Ex., R. 114-16, PAGEID# 6378; Rizzoni Vol. III, R. 100-1, PAGEID# 4238). A reasonable jury could infer Rizzoni's hostility toward Huang arose as a spiteful reaction to her avoidance of his physical displays of "affection."

Second, about a month before the December 2017 candidacy exam, Huang and Rizzoni had a verbal altercation during a WebEx meeting with the Ford URP team. (Counterstatement Ex., R. 114-26, PAGEID# 6409). Rizzoni berated Huang in front of the entire Ford team, accusing her of lying about software licenses, refusing to meet with him, and threatening to terminate her Ph.D because she would not meet with him in person. (Huang Rep., R. 105-12, PAGEID# 5962-63). Huang became "hostile" towards Rizzoni about meeting with him in his office on Sundays. (Counterstatement Ex., R. 114-26, PAGEID# 6409). Following the incident, Anderson e-mailed Rizzoni and expressed that "[i]t might not be about not wanting to work on Sunday, but rather to be alone in a man's office with no one else in the building." (Counterstatement Ex., R. 114-21, PAGEID# 6392). Within days following this incident, Rizzoni began taking steps to ensure Huang would not succeed on her candidacy exam. (Huang Depo., R. 102-1, PAGEID# 4697-98; Parry Ex., R. 94-4, PAGEID# 2410; Counterstatement Ex., R. 114-23, PAGEID# 6397-98). Following the pre-ordained result on her exam, Rizzoni decided not to allow Huang a second opportunity (despite this being customary) and promptly dismissed her from the Ph.D. program and the Ford URP. (Rizzoni Vol. III, R. 100-1, PAGEID# 4235-36, 4238-39; Counterstatement Ex., R. 114-25, PAGEID# 6403).

Presented with these facts, a reasonable jury could find that Huang engaged in protected activity and that, within a short time after, Rizzoni took adverse actions

against her. Accordingly, the district court's grant of summary judgment in OSU's favor on Huang's retaliation claim should be reversed.

## CONCLUSION

For the foregoing reasons, the judgments of the district court should be reversed remanded for trial on Huang's quid pro quo sexual harassment and retaliation claims against OSU and for a new trial on Huang's Section 1983 claim against Rizzoni.

Date: August 31, 2023

/s/Bruce. C. Fox, Esq.
Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
BNY Mellon Center, Suite 5240
500 Grant Street
Pittsburgh, PA 15219
Tel: (412) 566-1500

*Attorneys for Appellant*
*Meng Huang*

**STATEMENT OF RELATED CASES**

Appellant does is not aware of any related case pending in the Sixth Circuit.

Date: August 31, 2023

/s/Bruce C. Fox, Esq.
Bruce C. Fox

*Attorney for Appellant*
*Meng Huang*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010, Times New Roman 14-point font.

Date: August 31, 2023

*/s/Bruce C. Fox, Esquire*
Bruce C. Fox
*Attorney for Appellant Meng Huang*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of August 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 31, 2023

*/s/Bruce C. Fox, Esq.*
Bruce C. Fox

# ADDENDUM – DESIGNATION OF DOCUMENTS

| Title | R. and PAGEID Range |
|---|---|
| Transcript of Final Pretrial Conference Proceedings | R. 223, PAGEID# 8405 |
| Trial Transcript Vol. IV | R. 220, PAGEID# 8330-8401 |
| Trial Transcript Vol. III | R. 219, PAGEID# 8132-8329 |
| Trial Transcript Vol. II | R. 218, PAGEID# 7901-8131 |
| Trial Transcript Vol. I | R. 217, PAGEID# 7761-7900 |
| Notice of Appeal | R. 213, PAGEID# 7751-7752 |
| Judgment in Favor of OSU | R. 210, PAGEID# 7736 |
| Judgement in Favor of Giorgio Rizzoni | R. 207, PAGEID# 7718 |
| Jury Verdict | R. 205, PAGEID# 7708-7712 |
| Trial Exhibits | R. 204, PAGEID# 7645-7707 |
| Final Jury Instructions | R. 203, PAGEID# 7619-7644 |
| Opinion and Order on Plaintiff's Motion for Reconsideration | R. 188, PAGEID# 7295-7302 |
| Plaintiff's Motion for Reconsideration of Order Quashing Plaintiff's Trial Subpoenas | R. 185, PAGEID# 7268-7288 |
| Order on Defendant's Motion to Quash Trial Subpoenas | R. 183, PAGEID# 7256-7257 |
| Order Regarding Final Pretrial Conference Proceedings | R. 176, PAGEID# 7085-7087 |
| Plaintiff's Response in Partial Opposition to Motion to Bifurcate | R. 168, PAGEID# 7034-7035 |
| Opinion and Order on Defendants' Motion for Summary Judgment | R. 143, PAGEID# 6661-6703 |
| Plaintiff's Opposition to Defendants' Motion for Summary Judgment | R. 114, PAGEID# 6244-6568 |
| Defendant's Motion for Summary Judgment | R. 105, PAGEID# 5405-6197 |
| Notice of Filing Deposition Transcript Meng Huang | R. 102, PAGEID# 4588-5103 |
| Notice of Filing Deposition Transcript Giorgio Rizzoni Vol. III | R. 100, PAGEID# 4183-4377 |
| Notice of Filing Deposition Transcript Giorgio Rizzoni Vol. II | R. 99, PAGEID# 3946-4182 |

| | |
|---|---|
| Notice of Filing of Deposition Transcript Giorgio Rizzoni Vol. I | R. 98, PAGEID# 3431-3945 |
| Notice of Filing of Deposition of Jonathan J. Parry | R. 94, PAGEID# 2374-2416 |
| Notice of Filing Deposition Transcript Dyche Anderson | R. 76, PAGEID# 646-856 |
| Complaint | R. 1, PAGEID# 1-64 |